**Phillips & Paolicelli, LLP**
747 3rd Avenue, 6th Floor
New York, New York, 10017
Phone: 212-388-5100; Fax 212-388-5200
Attorneys for Plaintiffs
By: Steven Phillips, Esq.
    Victoria E. Phillips, Esq.
    Melissa Stewart, Esq.
    (*Pro Hac Vice Motion*
    *to be Submitted*)

**Szaferman Lakind Blumstein & Blader, P.C.**
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08534
Phone: 609-275-0400; Fax: 609-275-4511
Attorneys for Plaintiffs
By: Arnold Lakind, Esq.
    Robert Lytle, Esq.

**Cooney & Conway**
120 N. Lasalle Street, Suite 3000
Chicago, Illinois 60602
Phone: 312-236-6166; Fax 312-236-3029
Attorneys for Plaintiffs
By: Kevin Cooney, Esq. (*Pro Hac Vice*
    *Motion to be Submitted*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARLY CORRAR and SHIRLEY BOND,<br><br>    Plaintiffs,<br><br>vs.<br><br>SOLVAY SPECIALTY POLYMERS, USA, LLC; SOLVAY SOLEXIS, INC.; ARKEMA, INC.; E.I. DU PONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; AND JOHN DOE ENTITIES #1-10,<br><br>    Defendants. | CIVIL ACTION NO. _____<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Now come Plaintiffs, CARLY CORRAR and SHIRLEY BOND (collectively

"Plaintiffs"), by and through their undersigned counsel, and for their Complaint against

Defendants, SOLVAY SPECIALITY POLYMERS, USA, LLC, SOLVAY SOLEXIS, INC., ARKEMA, INC., E.I. DU PONT DE NEMOURS & COMPANY, THE CHEMORS COMPANY, THE CHEMORS COMPANY FC, LLC, THE 3M COMPANY, and JOHN DOE ENTITIES #1-10 (collectively "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by CARLY CORRAR ("Carly") and SHIRLEY BOND ("Shirley"). This case seeks to recover damages for personal injuries suffered by Carly, and also for derivative damages sustained by Shirley as a consequence of injuries to Carly.

2.      Plaintiff Carly Corrar suffers from profound and permanent personal injuries including:

a.      Physical and cognitive developmental delays and associated injuries including breaks in the wrist, rib, arm, and knee from frequent falls due to lack of coordination;

b.      Functional neurological disorder (also known as conversion disorder) resulting in inability to control limbs and prevent shaking;

c.      Digestive conditions including gastroparesis, chronic vomiting, gallstones, removal of gallbladder and appendix, and Barrett's esophagus;

d.      Temporomandibular disorders requiring jaw surgery;

e.      Attention Deficit Hyperactivity Disorder;

f.      Other psychiatric conditions;

g.      Joint issues including tendinitis, instability of the shoulder, and associated pain, which may be signs of early arthritis;

h.      Profound pain and suffering and mental anguish; and

i.      Loss of the ability to enjoy life's pleasures.

3.      Those injuries were foreseeably caused by Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of toxic and dangerous chemicals and substances.

4.      These include but are not limited to:

a.      poly- and perfluoroalkyl substances ("PFAS"), (for instance perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), as well as their replacement compounds, including but not limited to "GenX").

b.       halogenated hydrocarbons (*e.g.,* Dichloromethane, or Methylene Chloride. Trichloroethylene, Perchlorethylene);

c.      heavy metals (*e.g.,* lead, mercury, arsenic, copper,  antimony);

d.      freons;

e.      industrial alcohols and solvents (*e.g.,* acetone, toluene, acetonitrile, ethyl acetate, heptane, hexane, isopropynol, benzene, ethylbenzene, xylene);

f.      numerous mixtures and wastes consisting of multiple compounds, substances  and/or products (*e.g.,* paints, dyes, fuels, explosives, ammunition, hereafter collectively "mixtures"  or "waste");

g.      polycyclic aromated hydrocarbons ("PAHs"); and

h.      particulate matter and airborne waste.

5.      These substances and other toxins, (hereafter "toxins") individually and in mixtures have the capacity to cause:

      a.     adverse reproductive outcomes including infertility, subfertility, prematurity, spontaneous abortion, still birth, birth defects, developmental delays, genetic damage, and embryonic tumors;

      b.     malignancies, tumors, and neoplasms including brain cancer, kidney cancer, ovarian cancer, bladder cancer, testicular cancer, breast cancer, pancreatic cancer, colon cancer; and

      c.     additional severe non-malignant disorders.

6.     Further, these toxins have the capacity to act in an additive or synergistic fashion such that mixed exposures enhance or even multiply their capacity to inflict and accelerate the harm(s) of the type described above.

7.     In addition, the mechanisms by which these relevant toxins inflict harm are many, and include:

      a.     apoptosis (cell death),

      b.     oxidative stress,

      c.     genotoxicity (spontaneous or *de novo* mutation),

      d.     epigenetic change,

      e.     diminished cellular nourishment,

      f.     impaired cell to cell communication,

      g.     endocrine disruption,

      h.     impaired or excessive immune responses,

      i.     intrauterine growth retardation,

      j.     impaired organogenesis, and

      k.     the capacity to cross placental and brain barriers.

8.      There are no safe levels of exposures to these toxins, especially with mixed and prolonged exposures.

9.      Further while exposures to these toxins (*e.g.,* quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a biological gradient (dose-response) fashion such that increases in quantum, duration or timing increase the potential for harm, even a single exposure at vanishingly small quanta, unfortunately timed, has the capacity to cause the above described and other injuries. Accordingly, although the calculation of the precise dose of exposure to each toxins or mixture (and to the aggregate of all exposures) is not presently known, these exposures, from both a qualitative and quantitative perspective, are more than sufficient to have caused Carly's injuries.

10.     As a consequence of Defendants' intentional, knowing, reckless, grossly negligent, and negligent acts and omissions described herein, resulting in the contamination of the water, air, and soil, including but not limited to Plaintiffs' water supply, Plaintiffs seek to recover compensatory and punitive damages for the personal injuries suffered by Carly as well as for derivative damages sustained  by Shirley as a consequence of injuries to Carly.

**PARTIES**

11.     Carly is an adult citizen of the State of New Jersey, born on May 31, 1996.  From her birth until approximately 2018, Carly resided at and was domiciled at 50 North Railroad Ave. Pedricktown NJ 08067. Carly initially lived there with both parents, and when they separated, she continued to primarily live there with her mother, Plaintiff Shirley Bond, who is also a citizen of the State of New Jersey. At approximately age three, after Carly's parents separated, Carly also began visiting her father on weekends at 370 US-130 Penns Grove NJ 08069.

12.     From approximately 1962 to 1981, Carly's mother, Plaintiff Shirley Bond, resided at and was domiciled at 24 Woodstown, Pedricktown NJ 08067, the address at which Shirley's parents also lived during the year prior to Shirley's birth. Shirley has resided at and been domiciled at 50 North Railroad Ave. Pedricktown NJ 08067 since approximately 1981, which includes the period of Shirley's pregnancy with Carly. Carly's father moved into 50 North Railroad Ave. Pedricktown NJ 08067 in approximately the mid 1980s, and lived there up to and including the time of Carly's birth and for approximately two years thereafter.

13.     Carly's currently resides at and is domiciled at 95 ½ Apt. A Walnut Street Penns Grove, NJ 08069.

14.     Shirley's individual claims in this action relate to her entitlement to recover damages by virtue of derivative claims stemming from her daughter's injuries.

15.     The external routes of exposure involved airborne dispersion, groundwater, surface water, domestic water supplies, soil contamination, and vapor intrusion in and around the above addresses and adjacent neighborhoods.

16.     The exposures of greatest significance with respect to the etiology of Carly's injuries occurred during the period from one year prior to her conception and continuing through her *in utero* gestation and thereafter during her infancy and early childhood. However, that is not to say that other exposures are irrelevant.

17.     Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.  As a limited liability company Solvay USA's citizenship is determined by the citizenship of each of its members. *See, e.g., Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).  Upon information and belief based upon a search of

publicly available sources, Solvay USA's sole member is Ausimont Industries Inc.

("Ausimont"), a Delaware corporation. Ausimont is a holding company with no operations. Its

headquarters, president, and one of its board members are based in Houston, Texas. Accordingly,

Ausimont's principal place of business is Houston, Texas. *See, e.g., Hertz Corp. v. Friend*, 559

U.S. 77, 92-93 (2010); *Johnson v. Smithkline Beecham Corp.*, 724 F.3d 337, 347 (3d Cir. 2013).

Thus, Ausimont is a citizen of Delaware and Texas. Solvay USA, in turn, is also a citizen of

Delaware and Texas. Neither Solvay USA nor Ausimont are citizens of the same state as the

Plaintiffs.

18.     Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay

USA and was a corporation duly organized under the laws of the State of Delaware with its

principal place of business located in Houston, Texas.

19.     Defendants Solvay USA and Solvay Solexis will collectively be referred

hereinafter as "Solvay".

20.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its

principal place of business at 2000 Market Street, Philadelphia, PA 19103.

21.     Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly

organized under the laws of the State of Delaware with its principal place of business located at

974 Centre Road, Wilmington, DE 19805.

22.     Defendant The Chemours Company ("Chemours Co.") is a corporation duly

organized under the laws of the State of Delaware with its principal place of business located at

1007 Market Street, Wilmington, DE 19899.

23.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a corporation

duly organized under the laws of the State of Delaware with its principal place of business

located at 1007 Market Street, Wilmington, DE 19899.  As a limited liability company, Chemors

FC's citizenship is determined by the citizenship of each of its members. See, e.g., *Zambelli*

*Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).  Upon information and belief

based upon a search of publicly available sources, none of Chemors FC's members are citizens

of the same state as the Plaintiffs.

24.     Defendants Chemours Co. and Chemours FC will collectively be referred

hereinafter as "Chemours".

25.     Defendant The 3M Company ("3M") is a corporation duly organized under the

laws of the State of Minnesota with its principal place of business at 2501 Hudson Road,

Maplewood, MN 55144.

26.     Defendants John Doe Entities #1-10 are fictitious names of corporations,

companies, partnerships, or other business entities or organizations whose identities cannot be

ascertained as of the filing of this Complaint, certain of which are successors to, predecessors or

alter egos of, or are otherwise related to, the identified Defendants in this matter or which are

otherwise liable pursuant to the causes of action set forth herein.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 since none

of the Plaintiffs are domiciled in the same state as any Defendant and the amount in controversy

exceeds $75,000.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a

substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

29.     Plaintiff Carly Corrar suffers from profound personal injuries described above, including physical and cognitive developmental delays, and associated physical injuries including breaks in the wrist, ribs, arm, and knee from falls due to lack of coordination; functional neurological disorder (also known as conversion disorder) resulting in inability to control limbs and prevent shaking; digestive conditions including gastroparesis, chronic vomiting, gallstones, removal of gallbladder and appendix, and Barrett's esophagus; temporomandibular disorders requiring jaw surgery; other psychiatric conditions; joint issues including tendinitis, instability of the shoulder, and associated pain, which may be signs of early arthritis; profound pain and suffering and mental anguish; and loss of the ability to enjoy life's pleasures.

30.     These injuries were all proximately caused by the Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of toxic and hazardous chemicals including, but not limited to the toxins described in paragraph 4 above.

29.     With respect to the PFAS, PFOA PFNA and PFOS chemicals[1], the United States Environmental Protection Agency ("EPA") has identified 3M as the dominant global producer of PFOA and related chemicals.

30.     3M manufactures at least eighty-five (85%) percent of total worldwide volumes of PFOA and related chemicals.

31.     Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals.

32.     PFAS have been manufactured and used in the United States since the 1940s.

33.     PFAS have fire-resistant properties.

---

[1]Poly- and perfluoroalkyl substances ("PFAS"), whose compounds include perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX".

34.     PFAS act as oil, grease, and water repellants.

35.     PFAS have been used to make many household products such as Teflon®, Gore-Tex® Stainmaster®, Scotchgard®, and Tyvek®.

36.     PFAS compounds are a substantial threat to the environment and human health.

37.     Some PFAS have been classified as carcinogenic.

38.     Studies report that PFAS exposure  and exposures to the other toxins have the capacity to cause *inter* alia:  testicular cancer, kidney cancer, liver cancer, brain cancer, lymphomas, leukemia, breast cancer, lung cancer, autoimmune disorders, endocrine disorders, developmental and genetic defects to fetuses, developmental defects to breastfed babies, reduced vaccine response, neurological damage, central nervous system damage, cognitive impairment, increased cholesterol, and increased liver enzymes and a host of other disorders including those suffered by Carly.

39.     PFAS compounds and certain other toxins are resistant to degradation.

40.     PFAS compounds and certain other toxins persist indefinitely in the environment.

41.     PFAS compounds and certain other toxins or their metabolites bioaccumulate in living tissue.

42.     People who consume PFAS and other toxins via drinking water and are otherwise exposed accumulate increasing concentrations of PFAS and other toxins or their metabolites in their blood.

43.     For decades, Defendants and their predecessors in interest have known (or should have known) of the highly toxic characteristics of PFAS and other toxins.

44.     The New Jersey Department of Environmental Protection ("NJDEP") has devoted time to investigating and is continuing to identify and investigate the presence of PFAS and other

toxins in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS or other toxins in impacted areas.

45.    Chemicals including but not limited to "GenX" have been substituted by Defendants in lieu of their PFAS chemicals.

46.    These replacement chemicals are being inaccurately touted as short-chain and having shorter half- lives.

47.    These replacement chemicals do not break down in the environment.

48.    They have also been detected in drinking water, groundwater, and surface waters.

49.    In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

50.    In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

51.    In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

52.    NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

53.    NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

54.    On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

55.    NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

56.     NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc., Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiffs. Attached hereto as **Exhibit A** is a true and correct copy of the NJDEP Directive.

57.     The other toxins have also been the subject of repeated governmental evaluation and regulation by agencies of the federal government, the State of New Jersey, other state governments, and foreign regulatory bodies. Defendants are believed to have violated such regulations at relevant times and in relevant localities.

**I.     Solvay and Arkema's West Deptford Facility**

58.     Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 ("the West Deptford facility") from 1990 to present.

59.     Before 1990, Arkema owned and operated the West Deptford facility.

60.     Solvay manufactured polyvinylidene fluoride ("PVDF"), which is another PFAS compound, at the West Deptford facility.

61.     PVDF is a specialty plastic used in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

62.     On information and belief, Arkema manufactured PVDF and other high-performance materials at the West Deptford facility prior to 1990.

63.     Solvay's West Deptford facility was considered to have the second highest capacity in the world for purposes of using Surflon S-11 to make PVDF, which is composed of approximately 74% PFNA.

64.     In connection with its operations, Solvay released vast amounts of PFNA and other toxins into the surrounding air, soil, and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFNA chemical.

65.     At relevant times, Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to it by 3M.

66.     NaPFO degrades into PFOA.

67.     As a result of its operations, Solvay released vast amounts of PFOA into the surrounding air, water, and soil contaminating the site, off-site properties including Plaintiffs' and New Jersey's natural resources with the PFOA chemical.

68.     Prior to 1990, and at relevant times, as a result of their operations, Arkema released massive amounts of PFOA into the surrounding air, soil and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA and other relevant toxins.

## II.     DuPont and Chemours' Chamber's Works Facility

69.     For over a century, from 1891 to 2015, DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey.

70.     DuPont produced, used, and discharged into the environment approximately 1,200 separate chemicals, pollutants, and other hazardous substances from the Chambers Works facility. Upon information and belief, in addition to the PFOA/PFAS chemicals, many, if not

most of the other toxins discussed above were also wrongfully produced, used and discharged into the environment from this facility.

71.     PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

72.     Telomers were used and manufactured at Chambers Works.

73.     PFOA is a by- product of the telomer manufacturing process.

74.     At relevant times, 3M supplied DuPont with PFOA.

75.     DuPont also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this and other toxic waste along with wastewater from its on-site PFOA-related processes through its wastewater treatment plant.

76.     As a result of its operations, for decades, DuPont released massive amounts of PFOA as well as other PFAS, including PFNA, and other toxins from Chambers Works into the surrounding air, water and soil, contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources.

77.     In 2015, DuPont transferred its Chambers Works facility to Chemours.

78.     DuPont continued to operate at the location pursuant to an industrial lease through which DuPont was the tenant and Chemours FC was the landlord.

79.     Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that the site had been wrongfully contaminated with PFAS and other toxic substances.

80. Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that it was discharging PFAS and other toxins into the surrounding air and water contaminating off-site properties including Plaintiffs', and New Jersey's natural resources.

81. Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with a substantial number of wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined.

82. NJDEP has declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

83. NJDEP also declared that "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

84. DuPont and 3M committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

85. This conduct was performed with greed and in callous disregard of the public health as well as Plaintiffs' health and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products, and to reduce or eliminate their obligations to

otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiffs'
private wells.

## III.   Defendants' Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil

86.   For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS and other toxins.

87.   Despite that knowledge, Defendants continued to use PFAS and other toxins in products and release them into the environment.

88.   From as early as the 1970s, Defendant 3M knew that PFOA and PFOS and other toxins were harmful to people and the environment based on its own studies and review of relevant scientific and medical literature.

89.   Defendant 3M knew that PFAS and other toxins had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

90.   As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

91.   3M actively sought to suppress scientific research on the hazards associated with PFAS products and other toxins.

92.   3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products and other toxins.

93.   At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

94.     From studies of its own workers, Defendants DuPont knew that PFOA and other toxins were harmful to humans both alive and *in utero*.

95.     Defendants DuPont knew that PFOA and other toxins were being discharged into the environment, including the air, soil, groundwater, surface water and drinking or household water supply.

96.     Defendants DuPont failed to disclose the risks to regulators, the public or the Plaintiffs.

97.     In a 2003 report on Chambers Works, DuPont disclosed that PFOA was present in groundwater throughout the facility and at the perimeter at a concentration up to 46,000 ppt.

98.     However, DuPont falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

99.     Since at least 1991, Defendants Solvay knew that it was discharging large amounts of PFNA and other toxins into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086.

100.    In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

101.    That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

102.    In the samples tested, PFOA was detected at a concentration up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

103.    NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

a.  PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

b.  PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

104.    400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

105.    Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, genetic damage,  developmental birth defects to fetuses, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

106.    The routes of exposure to which each Plaintiff was exposed to the relevant toxins include: a) the ingestion of drinking water, b) the inhalation of vapors and particulate matter, and c) dermal contact and skin absorption. Carly was exposed *in utero* and at the time of conception to the relevant toxins and their metabolites which were present in her mother's body and also present in her father's body and particularly in his sperm and seminal fluid. She was also exposed to these toxins or their metabolites as an infant and throughout her life.

107.    Shirley has also suffered damages in her derivative capacity as Carly's parent and natural guardian.

108.    Defendants' misconduct, (both individually and collectively) and the resulting wrongful exposures, proximately caused Plaintiffs' injuries and damages as described above.

109.    As a consequence, each Defendant is individually and jointly and severally liable to Plaintiffs for both compensatory and punitive damages.

## CLAIMS

### Count I: Negligence

### Plaintiffs v. All Defendants (Including John Doe Entities #1-10)

110.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

111.    Defendants knew or should have known that the use of PFAS and/or discharge of PFAS and other toxins into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

112.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS and other toxins into the environment in close proximity to surrounding residential communities, including Plaintiffs' residence(s).

113.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 had a duty to take all reasonable measures to ensure that PFAS and other toxins would be effectively contained and not discharged into the surrounding environment.

114.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 had a duty to operate and manage their facilities and the related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

115.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 further had a duty to ensure that the manufacturing processes that they chose to employ did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including Plaintiffs' residence(s).

116.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 breached the above-stated duties by unreasonably disposing of PFAS and other toxins in a manner which made it foreseeable that they would enter the environment, specifically but not limited to the groundwater, exposing nearby residents, including Plaintiffs, who relied upon the groundwater for their drinking and household water supply.

117.    Defendant 3M had a duty to warn users of their PFAS and other relevant products of the dangers of releasing PFAS and other relevant toxins into the environment.

118.    Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-10, to avoid discharging PFAS and other relevant toxins into the environment where it was likely to enter the environment including the soil, air, and water including groundwater and be inhaled, absorbed and/or ingested by residents including Plaintiffs in surrounding communities,.

119.    Defendant 3M further breached a duty by neglecting to inform itself of the improper manner in which its purchasers, including the other Defendants mishandled highly toxic 3M products.

120.    As a direct and proximate result of these acts and omissions, Defendants individually and collectively wrongfully caused the environment to be contaminated with PFAS and other toxins, thereby exposing Plaintiffs to these chemicals and substances, and causing injury to them as described above.

121.    All Defendants contributed to the contamination of the environment with PFAS and other harmful substances, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

122.    The acts and omissions of Defendants were negligent, and as a result, Carly has suffered and/or will in the future suffer damage in the form of bodily injuries, developmental delays, emotional distress, economic loss, medical expenses and was otherwise damaged, for which Defendants are liable. Similarly, Shirley has suffered derivative damages for which Defendants are liable, including but not limited to extraordinary medical expenses incurred for the care of Carly, loss of services, loss of and companionship, and emotional distress.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count II: Gross Negligence and Recklessness
### Plaintiffs v. All Defendants (Including John Doe Entities #1-10)

123.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

124.    At all relevant times, Defendants, as detailed above, committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence.

125.    Specifically, Defendants caused, permitted, and allowed the release of PFAS and other toxins into the environment including the air, water, and soil, including the drinking water of Plaintiffs, constituting a want of care and a conscious indifference to the rights, welfare, safety, and health of Plaintiffs, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

126.    Such conduct was motivated by greed in an effort to maximize profit with disregard to their duties and responsibilities to the public and to Plaintiffs.

127.    All Defendants contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them and their property.

128.    Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiffs and an attendant reckless indifference to their health, safety, and welfare.

129.    Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiffs so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count III: Private Nuisance

### Carly Corrar and Shirley Bond v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

130.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

131.    Defendants' acts and omissions with respect to the release of PFAS and other toxins in the environment resulted in the contamination of the air, soil, and water, including but not limited to Plaintiffs' water supply, and have thus unreasonably interfered with Plaintiffs' use and enjoyment of their property, invading the home and body of Carly.

132.    Defendants' acts and omissions with respect to the release of PFAS and other toxins has made Plaintiffs' water supply unfit for consumption and other domestic purposes.

133.    Defendants' unreasonable interference with the use and enjoyment of Plaintiffs' property constitutes a continuous invasion of their rights.

134.    Defendants, Solvay, Arkema, DuPont and Chemours all contributed to the contamination of the environment with PFAS and other toxins, and all substantially contributed to a private nuisance on Plaintiffs causing Plaintiffs' injuries and damages as stated above.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count IV: Public Nuisance

### Carly Corrar and Shirley Bond v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

135.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

136.    Defendants' conduct detailed above unreasonably interfered with a right common to the general public, including the public's right to be free from environmental contamination in the air it breathes and water it drinks, and in which its members bathe, shower, and swim.

137.    Defendants' conduct detailed above unreasonably and significantly interfered with the public health and public safety by contaminating water, soil, and air with toxic and carcinogenic chemicals.

138.    Defendants' conduct was of a continuing nature, and/or produced a long-lasting effect, and Defendants knew and/or had reason to know that it would have a significant effect on the public's rights.

139.    Plaintiffs suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public.

140.    Defendants' acts and omissions with respect to the release of PFAS and other toxins in the environment including the air, soil, and water resulted in the contamination of Plaintiffs' home and water supply and injuries and damages as set forth above.

141.    Defendants' unreasonable interference with the use and enjoyment of Plaintiffs' property constitutes a continuous invasion of their rights.

142.    Defendants, Solvay, Arkema, DuPont and Chemours all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the public nuisance imposed on Plaintiffs.

143.    Defendants' creation of a continuing public and/or private nuisance has damaged Carly in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendants are liable. This also renders them liable to Shirley Bond derivatively.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count V: Past and Continuing Trespass

### Carly Corrar and Shirley Bond, v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

144.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

146.    As related above, Carly Corrar and Shirley Bond are and have been the owner(s) and/or possessor(s) of real property and reside or resided on those properties.

147.    Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS and other toxins resulting in its discharge into the

environment entering, invading, intruding, and injuring the rights of Plaintiffs to possess and enjoy their properties.

148.   Plaintiffs have not consented and do not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiffs would not consent to such.

149.   Defendants, Solvay, Arkema, DuPont and Chemours, all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the past and continuing trespass imposed on Plaintiffs.

150.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water wells applicable to Plaintiffs' properties have been contaminated with PFAS, and other toxins, causing significant personal injuries and damage, including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count VI: Strict Liability (Abnormally Dangerous Activities)**

**Plaintiffs v. Solvay, Arkema, DuPont, Chemours, 3M & John Doe Entities #1-10**

151.   Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

152.   At all relevant times, Defendants Solvay, Arkema, DuPont, Chemours, 3M and John Doe Entities #1-10 sold, disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

153.    As a result of Defendant 3M selling and Defendants Solvay, Arkema, DuPont, Chemours and John Doe Entities #1-10 discharging such substances from their sites, the groundwater under Plaintiffs' property was contaminated with hazardous substances, creating actual harm to Plaintiffs.

154.    The manufacturing, utilization, disposal, and discharge of PFAS and other toxins constitute abnormally dangerous activities that introduce an unusual danger in the community.

155.    Defendants' activities in selling, manufacturing, utilizating, disposing, and discharging of these products presented a high degree of risk of harm to the person, land, and/or chattels of others.

156.    It was likely that the harm resulting from Defendants' activities would be great.

157.    The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

158.    Defendants' activities are not a matter of common usage in the areas in which they were carried out.

159.    Defendants' activities were inappropriate to the locations in which they were carried out.

160.    The dangerous attributes of and risk posed by Defendants' activities outweighed their value to the community.

161.    The manufacturing, utilization, disposal, and discharge of these products are not matters of common usage in the areas where these activities were carried out.

162.    At all relevant times, the risk of the Defendants' abnormally dangerous activities outweighed the value to the community.

163.    Defendants' acts and omissions in selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiffs' properties and injuries and damages to Plaintiffs, making them strictly liable for the harm caused by such contamination.

164.    Defendants Solvay, Arkema, DuPont, 3M and Chemours all foreseeably contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury and damages to them as set forth above.

165.    As a direct and proximate result of Defendants' discharges of hazardous substances and contaminants, Plaintiffs have and will continue to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VII: Strict Liability (Failure to Warn)

### Plaintiffs v. 3M & John Doe Entities #1-10

166.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

167.    Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied PFAS and other toxins for sale and sold such products to Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 in the ordinary course of their businesses.

168.    Upon information and belief, Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 utilized the PFAS chemicals and other toxins supplied by Defendant 3M in a reasonably foreseeable and intended manner.

169.    The PFAS and other toxins sold by Defendant 3M were unreasonably dangerous to residents of surrounding communities, including Plaintiffs, without adequate warnings and instructions to prevent discharge of PFAS and other toxins into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs.

170.    Defendant 3M knew or should have known that the PFAS and other toxins they sold would be discharged into the environment and cause contamination of the water supply of residents and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiffs.

171.    Defendant 3M failed to advise Plaintiffs as well as  Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-10 which were purchasers, users or those foreseeably exposed, to their PFAS and other toxins about the risks these products posed to foreseeable third parties, such as Plaintiffs, and about techniques that could be employed to reduce or eliminate these risks.

172.    Defendant 3M had actual knowledge of the health hazards associated with PFAS and other toxins through both animal studies conducted by researchers employed or contracted by such Defendant and though experience with Defendant's own workers, but, upon information and belief, failed to share such information with purchasers, users or those foreseeably exposed to their products, including Plaintiffs, Defendants, DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10, or with governmental agencies.

173.    Defendant 3M acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS and other toxins were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiffs.

174.    Defendant 3M had a duty to warn users of their PFAS products and other toxins of the dangers of releasing PFAS and other toxins into the environment.

175.    Defendant 3M breached the above-stated non-delegable duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants, Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-10, to avoid discharging PFAS and other toxins into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

176.    As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VIII: Strict Liability (Defective Design)

### Plaintiffs v. 3M & John Doe Entities #1-10

177.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

178.    Defendant 3M designed, manufactured, and sold PFAS and other toxins that were used at the Chambers Works and West Deptford facilities and elsewhere by Defendants DuPont, Chemours, Solvay, Arkema and John Doe Entities #1-10.

179.    As a manufacturer and seller of PFAS and other toxins, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

180.    Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiffs.

181.    Defendant 3M's PFAS products and other toxins were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

182.    Defendant 3M knew or should have known that use of its PFAS and other toxins used by Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 would result in the spillage, discharge, and/or release of PFAS and other toxins into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiffs'.

183.    Defendant 3M knew or should have known that its PFAS and other toxins would eventually come into contact with and harm residents in surrounding communities, including Plaintiffs.

184.    Defendant 3M's PFAS products were defective in design and unreasonably dangerous because, among other things:

a.    PFAS and other toxins cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

b.      PFAS and other toxins' contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiffs, poses significant threats to their health, safety, and welfare.

185.    At all relevant times, Defendant 3M's PFAS and other toxins which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

186.    The foreseeable risk to public health and welfare, including that of Plaintiffs', posed by Defendant 3M's PFAS and other toxins outweighed the cost to Defendant 3M of reducing or eliminating such risk.

187.    Defendant 3M knew or should have known about reasonably safer and feasible alternatives to PFAS and other toxins.

188.    As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer injuries and damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

### Count IX: Punitive Damages

### Plaintiffs v. All Defendants (Including John Doe Entities #1-10)

189.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

190.    At all material times hereto, Defendants knew or should have known that their PFAS and other toxins would contaminate the environment including the air, soil, and

groundwater and contaminate the drinking and household water of residents in surrounding communities, including Plaintiffs.

191.    At all material times hereto, Defendants knew or should have known that PFAS and other toxins were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would eventually reach Plaintiffs' property, soil, air, and drinking and household water wells thus exposing them to high and injurious concentrations of the hazardous chemicals.

192.    At all material times hereto, Defendants knew or should have known of the health and environmental impacts of PFAS and other toxins for decades but continued to use them in products and release them into the environment.

193.    At all material times hereto, Defendants knew that PFOA and PFOS and other toxins were harmful to people and the environment based on its own studies.

194.    At all material times hereto, despite actual or constructive knowledge of their chemicals' toxicity to humans and the environment, Defendants proactively sought to conceal that information from the public.

195.    At all material times hereto, despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous properties, including knowingly and purposefully withholding material information from regulators and governmental agencies.

196.    At all material times hereto, even after Defendants acquired actual knowledge that they were causing groundwater, soil, air, and drinking water contamination and thus exposing nearby residents to its PFAS and other toxins, including Plaintiffs, Defendants continued their operations and continued discharging these toxins into the environment and exposing residents in

surrounding communities, including Plaintiffs, in reckless and conscious disregard for the serious health and safety risks associated with such exposure.

197.    At all material times hereto, Defendants committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

198.    At all material times hereto, Defendants knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiffs, to have access to clean air, soil, water, and drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS and other toxins into the environment, air, soil, and groundwater, had no justification for doing so, and made no effective effort to alleviate the problem.

199.    Such conduct was motivated by greed and taken in deliberate and knowing disregard of their duties to Plaintiffs and all similarly situated individuals.

200.    Defendants' acts and omissions as set forth in the preceding paragraphs demonstrate their reckless and conscious disregard the health, safety, and welfare, of residents in the community, including Plaintiffs.

201.    As a direct and proximate result of Defendants' conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiffs, Plaintiffs suffered and continue to suffer severe and permanent personal injuries and other damages, both economic and noneconomic, as set forth above.

202.    The aforesaid conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities,

including Plaintiffs, thereby entitling them to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

203.     Defendants' actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and demonstrates conscious indifference to the consequences.

WHEREFORE, Plaintiffs request that this Court award punitive damages against all Defendants, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Steven Phillips, Esq. is hereby designated as trial counsel on behalf of Plaintiffs.

## CERTIFICATION PURSUANT TO L.CIV.R. 11.2

The undersigned counsel certify that, with the following exceptions, the matter in controversy is not the subject of any other action pending or contemplated:

> Bond, et al. v. Solvay Specialty Polymers USA, LLC, et al., No. 1:20-cv-08487-NLH-JS
>
> Slusser et al. v. Solvay Specialty Polymers USA, LLC, et al., No. 1:20-cv-11393-NLH-JS
>
> Giordano, et al. v. Solvay Specialty Polymers USA, LLC et al., No. 19-cv-21573-NLH-JS
>
> Severa, et al. v. Solvay Specialty Polymers USA, LLC et al., No. 20-cv-06906-NLH-JS
>
> NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al. No. 2:19-cv-14758-JMV-SCM
>
> NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al. No. 1:19-cv-14765-NHL-JS

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 1:19-cv-14766-RMB-JS

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 3:19-cv-14767-MAS-ZNQ

The undersigned counsel further certify that we are aware of no other parties who should be joined in this matter at this time.

**PHILLIPS & PAOLICELLI, LLP**
Attorneys for Plaintiffs

BY:   s/  Steven Phillips
Steven Phillips, Esq.

**SZAFERMAN LAKIND BLUMSTEIN**
**& BLADER,**
Attorneys for Plaintiffs

BY:   s/  Arnold Lakind
Arnold Lakind, Esq.

BY:   s/  Robert Lytle
Robert Lytle, Esq.

Dated:  January 8, 2021